# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### June 12, 2001 Session

## STATE OF TENNESSEE v. VINCENT HATCH

**Appeal from the Criminal Court for Shelby County**
**No. 98-07400     John P. Colton, Jr., Criminal Court Judge**

---

### No. W2000-01005-CCA-R3-CD - Filed October 19, 2001

---

One day before his scheduled jury trial for first degree murder, the appellant sought and was granted the right to represent himself. He now appeals from his conviction by a Shelby County jury for the offense of first degree murder, asserting that the convicting evidence was insufficient and that the trial court denied him his constitutional right to the assistance of counsel. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3, Appeal as of Right; Judgment of the Criminal Court Affirmed**

CORNELIA A. CLARK, SP. J., delivered the opinion of the court, in which JOE G. RILEY and NORMA MCGEE OGLE, JJ., joined.

A. C. Wharton, Jr., District Public Defender, Tony N. Brayton, Assistant Public Defender, and Mary K. Kent, Assistant Public Defender, on appeal; Vincent L. Hatch, *Pro Se*, at trial.

Paul G. Summers, Attorney General, J. Ross Dyer, Assistant Attorney General, William L. Gibbons, District Attorney General, and James A. Wax, Assistant District Attorney General.

## OPINION

On June 11, 1998, the appellant, Vincent Hatch, was indicted for the first degree premeditated murder of Rosmari Pleasure on March 2, 1998. On July 21, 1998, the Shelby County Public Defender was appointed to represent the appellant. At the same time an order was entered directing the appellant to be evaluated to determine his mental competency to stand trial and his mental capacity at the time of the offense.

On August 20, 1998, the trial court received written notice that the appellant was competent to stand trial and was, at the time of commission of the offense, able to appreciate the wrongfulness of his actions. On December 14, 1998, an order was entered directing the appellant to be transferred to the custody of the Commissioner of Mental Health for thirty days for further evaluation. On March 10, 1999, the trial court received a letter from the Midtown Mental Health Center stating that

the appellant's competency to stand trial had become questionable. On March 11, 1999, an order was entered transferring the appellant to the Middle Tennessee Mental Health Institute for further evaluation. On May 14, 1999, the trial court received written notice from the department that the appellant was capable of assisting in his own defense and that he did not meet the criteria for establishing an insanity defense.

On February 28, 2000, the appellant appeared in open court with counsel, who announced she was ready for trial. The appellant then requested the right to represent himself at trial, which was scheduled to begin the next day. The primary basis of his request was that he wished to pursue an insanity defense and that his appointed counsel was not willing to do so. The trial judge addressed the appellant at length in open court. At the conclusion of the colloquy, the court granted the request of the appellant to proceed *pro se*. The court named the assistant public defender who had prepared the case to serve as standby counsel during the trial. However, the trial judge denied the appellant's request to continue the trial date.

The appellant's jury trial commenced February 29, 2000. Several witnesses testified for the state.

Ashley Oates testified that in early 1998 she lived in one apartment of a four-apartment unit at 207 Hawthorne in Memphis. Rosmari Pleasure lived in the same apartment complex. Oates knew the appellant, Vincent Hatch, as Pleasure's boyfriend.

Just after noon on March 2, 1998, Oates was at home for lunch when she heard a scream. She looked out her kitchen window and saw Pleasure crouched near the back of her apartment building. The appellant was standing over her. Oates thought Pleasure might have fallen or hurt her ankle. Oates opened her door and called out, asking Pleasure if she was all right. Pleasure answered that the appellant had a gun. She asked Oates to call the police. According to Oates, the appellant then spoke in a sarcastic but calm manner and confirmed that she should call the police. Oates then closed her back door.

A few seconds later Oates heard a gunshot. She looked out the window and saw the appellant standing over Pleasure. She also saw the appellant shoot Pleasure a second time, while standing only two or three feet from the victim. Oates immediately dialed 911.

On cross examination Oates acknowledged that she was not aware of any prior instances of domestic violence between the victim and the appellant.

Jerry Banks was a friend of the appellant's for fifteen years. On the afternoon of March 3, 1998, Banks encountered the appellant walking down a sidewalk. Banks stopped his car and the appellant entered it and began talking. He told Banks that he had taken Rosmari Pleasure's life. He did not provide details. The appellant had in his possession some clothes, a bag, and a weapon. The men drove to Banks' church, and Banks put the gun in the trunk of his car. Banks then drove the appellant to his grandmother's house. The police arrived a few minutes later, Banks told them about

the gun, and an officer removed the gun from the trunk of the car. According to Banks, the appellant was upset and crying at the time. He spoke about unhappy events in his past. However, he was coherent. He understood that he was in trouble, and did not seem to be out of touch with reality. He also did not appear to be intoxicated.

Under cross examination by the appellant, Banks testified that he had never seen the appellant fight, smoke cigarettes, use drugs, or engage in an argument. The appellant's behavior in this incident therefore came as a surprise to Banks. He acknowledged that the appellant appeared to have some emotional problems. However, Banks did not fear harm to himself.

Officer Larry Colburn, a crime scene officer with the Memphis Police Department, testified that on March 3, 1998, he was called to a residence at 337 Essex. There he recovered a handgun from the trunk of a vehicle. The weapon was fully loaded with six live .38 caliber rounds. He identified the weapon as the same one Jerry Banks had testified belonged to the appellant.

Dr. O. C. Smith, an expert in the field of forensic pathology and wound ballistics, is the Shelby County Medical Examiner. He performed an autopsy on the body of Rosmari Pleasure. Dr. Smith testified that Pleasure suffered a gunshot wound to the back of her head. The bullet passed through the central portion of her brain, producing bone chips, and lodged behind her right eyeball. Pleasure also had bruises and abrasions on both sides of her face, the tip of her nose, the top of her brow, and her tongue. She had a bruise on the front of her chest near her right armpit, and some abrasions on the back of her right hand. Pleasure also suffered a gunshot wound to the outside and back of her left knee. Dr. Smith confirmed the cause of her death as multiple gunshot wounds. According to Dr. Smith the weapon used to inflict the gunshot wounds was fired from a distance of two or more feet from the victim. The abrasions on the left side of the victim's face were caused by contact with an object consistent with the handgun. The bullet recovered from the victim's head was possibly a .38 or .357 caliber bullet. Dr. Smith identified the weapon recovered from the appellant as being capable of producing wound ballistics consistent with those found on the victim. Dr. Smith also testified about the safety mechanism found on the appellant's weapon, and about how difficult it would be to discharge it accidentally.

The appellant, after being advised of his right against self-incrimination, testified at trial that in early 1998 he was a full-time student at the University of Memphis, and also attended classes at Shelby State Community College. On March 2, 1998, he was on his way to class when he stopped to drop off some clothing at Rosmari Pleasure's house. He was carrying a gun because he had been attacked several times in the last six years, the last incident occurring only a few days prior.

The appellant described the victim, Rosmari Pleasure, as someone that he loved very much. However, he also had been experiencing some emotional problems. The appellant testified that as he saw Pleasure he ran toward her with the gun in his hand. He wanted the victim to listen to him. The gun went off accidentally. The appellant testified that he was uncertain how the second shot was fired. He felt that he may have been hallucinating. The appellant testified that he had no real memory of the incident. However, he denied that he was a "mad dog killer".

Appellant Hatch described Pleasure as an innocent victim, and stated that he was on trial for killing the wrong person. He acknowledged that he was upset because he had been having problems with another woman. He claimed that the other woman had raped him and conceived a child without his consent. Although the appellant was unable to tell the jury exactly what mental problems he suffered, he asserted that he had been receiving counseling for mental and emotional problems since age ten. He also testified about the murder of his prostitute mother; the unpleasant time he spent living with his father, who had a serious cocaine problem and an extensive criminal record; and his suicide attempt in 1992.

After he realized what had happened, the appellant testified that he drove around and drank beer. He then drove to his mother's grave and asked her to provide a miracle and bring the victim back to life. When he encountered Mr. Banks the next day, he was on his way back to the cemetery, where he intended to commit suicide.

The appellant spoke at length about the unhappy events in his life. He stated that his academic prowess was unparalleled, but that his emotional problems had caused many troubles.

On cross examination the appellant admitted that he murdered Rosmari Pleasure. He also admitted providing a full statement to the police the day after the murder. In the police statement the appellant acknowledged that he and the victim had been having problems and had broken up. Upon his arrival at the apartment the appellant began struggling with the victim because he was trying to force her to listen to him and trying to grab her key and go into her apartment. The gun went off. According to the statement, he shot the victim a second time because he was angry and hurt.

The appellant also acknowledged that, on the day after the murder, he had admitted the killing to Jerry Banks. He finally acknowledged that the gun he placed in Jerry Banks' car was the murder weapon. However, he denied that the gun belonged to him, or that he had ever reloaded it. He claimed that he was insane at the time of the offense.

Dr. Samuel Craddock, a clinical psychologist with the Middle Tennessee Mental Health Institute in Nashville, was called as an expert witness by the appellant. He testified that he had examined the appellant in April 1999. Based on that examination, the statements made by the appellant to Banks and the police, and other information, Dr. Craddock concluded that the appellant did not have a history of serious mental illness, that he was competent to stand trial, and that he could not sustain an insanity defense. Dr. Craddock believed the appellant was in touch with reality. Even though the appellant described a very unhappy childhood, he was able to appreciate the wrongfulness of his behavior. Dr. Craddock confirmed that, while in the Navy, appellant was diagnosed with personality disorder. However, he did not define that disorder as a serious mental illness. He also did not define chronic depression as a serious mental disorder.

On cross examination Dr. Craddock confirmed that persons with borderline personality disorder are subject to inappropriate anger responses if they perceive they are being abandoned by

a loved one. Such persons often portray themselves as victims of circumstance. Dr. Craddock further testified that a person who is not severely mentally ill cannot experience a brief period of insanity.

The appellant argued to the jury that it should find him not guilty by reason of insanity. After deliberation, the jury returned a verdict of guilty of first degree murder. Because the state did not seek additional penalties, the judge imposed an automatic sentence of life in prison.

After the appellant's motion for new trial was overruled on April 14, 2000, the trial court appointed the public defender's office to represent the appellant on appeal.

## Analysis

The appellant first contends that he was denied his constitutional right to the assistance of counsel. The right to assistance of counsel in the preparation and presentation of a defense to a criminal charge is grounded in both the Tennessee and the United States Constitutions. Tenn. Const. art. I, §9; U.S. Const. amend. VI. However, there also exists an alternative right to self-representation which is founded on the Sixth Amendment. *Faretta v. California*, 422 U.S. 806, 819, 95 S.Ct. 2525, 2533, 45 L.Ed.2d 562 (1975); *State v. Northington*, 667 S.W.2d 57 (Tenn. 1984).

The right to self-representation and the right to counsel have been construed to be alternative ones; "that is, one has a right *either* to be represented by counsel *or* to represent himself, to conduct his own defense." *State v. Melson*, 638 S.W.2d 342, 359 (Tenn. 1982). "Waiver of one right constitutes a correlative assertion of the other. . . . [A] criminal defendant cannot logically waive or assert both rights." *State v. Burkhart*, 541 S.W.2d 365, 368 (Tenn. 1976) (quoting *United States v. Conder*, 423 F.2d 904, 908 (6th Cir. 1970)). One who knowingly and intelligently waives the right to counsel cannot later allege the deprivation of effective assistance of counsel. *See State v. Goodwin*, 909 S.W.2d 35, 41-42, 45 (Tenn. Crim. App. 1995).

There are three prerequisites to the absolute right of self-representation: (1) the assertion of the right must be timely; (2) the accused's request must be clear and unequivocal; and (3) the accused must knowingly and intelligently waive the right to the assistance of counsel. *State v. Herrod*, 754 S.W.2d 627, 629-30 (Tenn. Crim. App. 1988) (citations omitted). Appellant claims the first and third conditions were not met in this case.

Appellant contends that because his request to proceed *pro se* was not asserted until the day before trial, the court should not have granted it unless a continuance also was granted. While assertion of the right generally must be made prior to jury selection to be considered timely, *see, e.g., Herrod*, 754 S.W.2d at 629 (citations omitted), we believe the trial judge would have been justified in denying this request based on its timing. However, generally, the grant or denial of a continuance is discretionary with the trial court. *State v. Seals*, 735 S.W.2d 849 (Tenn. Crim. App. 19987). The decision will not be overturned absent an abuse of discretion and a showing that, had

the continuance been granted, the results of the proceeding would have been different. *State v. Morgan*, 825 S.W.2d 113, 117 (Tenn. Crim. App. 1991).

The decisions of the trial court concerning the timeliness of appellant's request to proceed *pro se* and for a continuance were matters of discretion. The appellant cites no case law to the contrary. He has not offered any proof that the result of the proceeding would have been different if a continuance had been granted. This issue is without merit.

The appellant also contends that the trial court failed to ascertain whether his waiver of the right to assistance of counsel was intelligent and knowing. This pre-condition is more difficult to determine. When an accused desires to proceed *pro se*, the trial judge must conduct an intensive inquiry as to his ability to represent himself. *Northington*, 667 S.W.2d at 61. The waiver of right to counsel must be knowingly and intelligently made. *State v. Armes*, 673 S.W.2d 174, 177 (Tenn. Crim. App. 1984); Tenn. R. Crim. P. 44. In *Johnson v. Zerbst*, 304 U.S. 458, 465, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), the United States Supreme Court placed "the serious and weighty responsibility . . . of determining whether there is an intelligent and competent waiver" directly upon the trial judge. In a subsequent case, more specific guidelines were established:

> [A] judge must investigate as long and as thoroughly as the circumstances of the case before him demand. The fact that an accused may tell him that he is informed of his right to counsel and desires to waive this right does not automatically end the judge's responsibility. To be valid such waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances and mitigation thereof, and all other facts essential to a broad understanding of the whole matter. A judge can make certain that an accused's professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination of all the circumstances under which such a plea is tendered.

*Von Moltke v. Gillies*, 332 U.S. 708, 723-24, 92 L.Ed. 309, 68 S.Ct. 316 (1984). This court has previously ruled that trial judges should question a defendant who wishes to proceed *pro se* according to the guidelines contained in **One Bench Book for United States District Judges 1.02-2 to -5 (3d. Ed. 1986),** also contained in the appendix to *United States v. McDowell*, 814 F.2d. 245, 251-52 (6th Cir. 1987). *Herrod*, 754 S.W.2d at 630.

The record in this case establishes that the trial judge followed the requirements of *Herrod*, asking substantially all the questions originally outlined in *McDowell*. The colloquy was extensive. The court warned the appellant that self representation was unwise, that he would be held to the same standards as an attorney trained in the law, and that he was not well served in representing himself. The only matter omitted from the colloquy was a discussion of possible lesser included offenses.

The trial judge concluded by granting appellant's request to designate former appointed counsel as standby counsel. Counsel had already announced to the court that she was ready for trial. We find that appellant's waiver of counsel was knowingly and intelligently made. This issue is without merit.

Defendant finally contends that his waiver was not voluntary because the trial court failed to secure the waiver in writing. Rule 44(a) of the Tennessee Rules of Criminal Procedure provides that, after the colloquy in open court, the court shall require the defendant to sign a written waiver, which shall be spread upon the minutes of the court and made a part of the record of the case. In this case no written waiver was signed or filed. However, a trial court's failure to comply with the writing requirement of Tenn. R. Crim. P. 44 does not necessarily preclude a constitutionally valid waiver. *See State v. Goodwin*, 909 S.W.2d. 35, 39-40 (Tenn. Crim. App. 1995); *State v. Mohammed F. Ali*, No. 03C01-9802-CR-00065, Washington County (Tenn. Crim. App., Knoxville, August 24, 1999); and *Luther Fowler v. State*, No. 03C01-9711-CR-00509, Hamilton County (Tenn. Crim. App., Knoxville, July 30, 1999). While we do not condone this omission, we have concluded from our review of the record that such error was harmless. The appearance of the appellant with his appointed counsel and the ensuing lengthy dialogue between the trial judge and the appellant has been transcribed and made a part of the record. It is apparent that the appellant knowingly and intelligently waived his right to counsel. This issue is without merit.

The defendant next claims that the evidence is insufficient to sustain his conviction for first degree murder. When an accused challenges the sufficiency of the convicting evidence, the standard is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, not this court. *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). Nor may this court reweigh or reevaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). A verdict of guilty by the jury, approved by the trial judge, accredits the testimony of the state's witnesses and resolves all conflicts in the testimony in favor of the state. *See State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994).

First degree murder is defined, in part, as the "premeditated and intentional killing of another". Tenn. Code Ann. §39-13-202(a)(1). An intentional killing occurs when it is the defendant's "conscious objective or desire to engage in" the killing or to cause death. *Id.* §39-11-302(a). A premeditated killing occurs when "done after the exercise of reflection and judgment". *Id.* §39-13-202(d). That is, "the intent to kill must have been formed prior to the act itself", although "it is not necessary that the purpose to kill pre-exists in the mind of the accused for any definite period of time". *Id.* "The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine if the accused was sufficiently free from excitement and passion as to be capable of premeditation". *Id.*

Because premeditation entails proof of a state of mind about which there may be no direct evidence, "cases have long recognized that the necessary elements of first degree murder may be

shown by circumstantial evidence". *State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992). Premeditation is a question of fact to be determined by the jury. *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000). And, the jury may infer premeditation from the manner and circumstances of the killing. *See State v. Pike*, 978 S.W.2d 904, 915 (Tenn. 1998); *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Bordis*, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995). Our Supreme Court has enumerated several factors that may support the existence of premeditation and deliberation, including: (1) declarations by the defendant of an intent to kill, (2) evidence of procurement of a weapon, (3) the use of a deadly weapon upon an unarmed victim, (4) the particular cruelty of the killing, (5) infliction of multiple wounds, (6) preparation before the killing for concealment of the crime, (7) destruction or secretion of evidence of the murder, and (8) calmness immediately after the killing. *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000) (citations omitted).

The evidence at trial presented several of the factors from which the jury could infer premeditation. The appellant admitted he was angry at the victim because she had terminated their romantic relationship. The appellant procured a weapon before coming to the victim's home. He used the weapon on an unarmed victim. He inflicted multiple wounds, first shooting the victim in the leg to immobilize her, then standing over her to shoot a second time at close range. He also apparently struck her in the face with the gun. After the killing the appellant calmly drove around and drank beer.

Whether or not premeditation existed is a jury question, and the appellant has not met his burden of illustrating why the evidence is insufficient to support the jury's decision in this matter. This issue is without merit.

The appellant attempted to present an insanity defense, which would have been an affirmative defense to the charge of first degree murder. The appellant argued that, because of his mental condition, he lacked the requisite intent to commit first degree murder. However, the only expert evidence he presented was from Dr. Samuel Craddock, who testified that he had examined the appellant, believed him competent to stand trial, and believed that a defense of insanity could not be sustained. The appellant himself testified about his unfortunate childhood and his prior treatment for emotional problems, but did not explain specifically how these problems led to his insanity.

The jury determined that, at the time of the offense, the appellant was not suffering from any mental condition which may have lessened his capacity to form the intent to commit the charged offense. The jury verdict, approved by the trial judge, accredits the witnesses for the state and resolves any conflicts in the testimony favorably for the state. *State v. Eaves*, 959 S.W.2d 601, 604 (Tenn. Crim. App.1997). The evidence was sufficient to prove, beyond a reasonable doubt, that the defendant had the capacity to form the requisite intent to commit premeditated first degree murder. This issue is without merit.

For the reasons set forth above, the judgment of the trial court is affirmed.

                                            _____
                                            CORNELIA A. CLARK, SPECIAL JUDGE